### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

```
GARRARD J. PARE,             :
        Plaintiff,           :
                             :
v.                           :      Civil No. 3:03cv1483 (JBA)
                             :
CITY OF BRISTOL,             :
        Defendant.           :
```

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 21]

Police officer Garrard Pare filed a three-count complaint against his employer, the City of Bristol, alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12111 et seq., the Connecticut Fair Employment Practices Act (CFEPA), Conn. Gen. Stat. § 46a-60, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 et seq. See Complaint [Doc. # 1]. He seeks backpay for the period between August 17, 2001, when he requested to return to light duty following a traumatic brain injury, through Spring 2003, when defendant reinstated him to his job as a patrolman. Id. at ¶¶ 21-22. Currently before the Court is defendant's motion for summary judgment on all counts. See Mot. for Summary Judgment [Doc. # 21]. Oral argument was held July 8, 2005, and defendant filed supplemental briefing in support of summary judgment on July 19. See [Doc. # 36]. For the reasons that follow, defendant's motion will be granted.

### I.   FACTUAL BACKGROUND

Plaintiff was hired as a police officer for the City of Bristol in 1987. Pare Dep., Pl. L.R. 56(a)(2) Stmt. [Doc. # 27],

1

Ex. 1, at 7.  While on duty on February 7, 2000 he responded to
an emergency call.  When he got out of his patrol car at the
scene, he slipped on ice, hitting the back of his head, breaking
his left elbow, and injuring his right knee.  Id. at 17.  The
last thing he remembers from the accident is calling the police
department's dispatcher and reporting that he had fallen and
believed he had broken his elbow.  Id. at 18.  His next memory is
being discharged from the hospital.  Id.  He was taken first to
the Bristol Hospital emergency room and then, when neurological
symptoms became apparent, transferred to St. Francis Hospital in
Hartford.  Report of  Stephen A. Torrey, M.D., Def. Mem. of Law
in Support of Mot. for Summary Judgment [Doc. # 22], Ex. C at 1.
Plaintiff refused recommended inpatient rehabilitation treatment
following his hospitalization.  Report of Emily B. Littman,
Ph.D., 4/18/00, Def. Mem. of Law in Support of Mot. for Summary
Judgment, Ex. D at 1.

Shortly after his injury, on March 14, 2000, neurosurgeon
Stephen Torrey examined plaintiff on an outpatient basis.  Report
of Stephen A. Torrey, M.D., at 1.  Dr. Torrey noted "persistent
symptoms following a relatively mild head injury," and referred
plaintiff for further tests.  Id. at 2.  In the interim, Dr.
Torrey stated that the plaintiff "is physically capable," but
"should not be in a work situations [sic] which might place him
at risk if he has some short-term memory deficits at this time

2

until further testing can be performed.  Further management will
be discussed pending this information." Id.

Approximately one month later, plaintiff underwent
neuropsychological testing administered by Emily Littman, Ph.D.
Dr. Littman wrote that "memory is the patient's greatest
complaint, with both immediate and remote memory impaired.
During the interview, the patient's wife had to assist him in
providing some of the facts." Report of Emily B. Littman, Ph.D.,
at 6.  Dr. Littman further noted that on psychological testing,
the plaintiff's "visual recall" was between the 5th and 14th
percentile, placing him "in the low average range." Id. at 7.
Pare's "general memory index was at the 19th percentile, in the
low end of the average to low average range." Id.  Dr. Littman
opined that the plaintiff's memory at the time of testing likely
was "slightly below" pre-accident levels. Id.  She recommended a
"full rehabilitation program ... including occupational and
physical therapy ... and speech and language therapy," as well as
further medical testing and psychiatric counseling for apparent
depression. Id. at 10.  Finally, she recommended "[i]f, and
when, the patient returns to the police force, he should first be
assigned a non-crucial, non-emergency work setting, and be
observed at that job prior to his return to active duty." Id.

Pare testified that at the time he saw Dr. Littman in 2000,
he was unable to perform the duties of a police officer.  Pare

Dep. at 24.  He explained, "I think the whole job performance probably would have been poor, I mean, with the lack of memory. So I wasn't able to do the job at that point."  Id. at 25.

Over the next year, Pare underwent speech, cognitive, psychological, physical and occupational therapy, and in February 2001 Dr. Littman retested him.  Report of Emily Littman, Ph.D., 2/12/01, Def. Mem. of Law, Ex. E at 9.  At that point she found that Pare had "made significant improvements in many areas, including significant improvements in visual memory... . However, ... immediate recall of both verbal and visual material and delayed verbal recall are below estimated premorbid levels. He also tends to work slowly and to fatigue relatively easily." Id.  Dr. Littman therefore recommended that "the patient has the capacity to return to competitive employment, but not necessarily the type of life and death rapid decision making type of employment he was employed in as a street patrolman."  Id.  She suggested that, if available, Pare "could be considered for some type of light duty within the police force, but if this is not possible, he might wish to seek vocational training and employment in a different area."  Id.

On April 3, 2001, Dr. Littman confirmed her findings in a letter to plaintiff's disability insurer, stating:

> ... my most recent neuropsychological evaluation on Mr. Pare, conducted in 2001, revealed that despite improvement, he still showed significant deficits in areas of mental speed and processing which interfere with

> his capacity to return to work as a police officer.  The
> results of the evaluation indicate a permanent, partial
> disability in mental status functioning the 10% level
> [sic]. While additional therapies will provide further
> improvement, it is my opinion that therapy will not
> substantially change his disability rating or Mr. Pare's
> ability to perform his job as a police officer.  It is my
> opinion that ... he will never be able to return to full
> duty as a police officer.

Letter from Dr. Littman to Lou Cusano, Def. Mem. of Law, Ex. F.

On July 12, 2001, the Workers Compensation Commission referred plaintiff to Richard Delaney, Ph.D., for a second opinion on his ability to resume his position as a patrolman. See Report of Richard C. Delaney, 7/12/01, Def. Mem. of Law, Ex. H.  Dr. Delaney's findings "corroborate[d]" Dr. Littman's. Id. at 6.  On examination, Dr. Delaney found that "[m]ild problems with learning and memory remain evident." Id.  He further noted that Pare's case was challenging because:

> though [Pare] continues to show mild memory problems, his
> level of functioning, even in the area of memory, is too
> high to benefit from most rehabilitation therapy
> approaches.  His reaction time, psychomotor speed, and
> thinking abilities are normal and probably at a level
> consistent with his co-workers at this point.  Clearly,
> he would be able to return to the type of work described
> by Dr. Littman; and, despite his weak memory on formal
> testing, it is possible he could work as a patrolman -
> especially in a two person situation.  However, ... the
> present results cannot document 100% recovery.

Id. at 6.  Nonetheless, Pare indicated to Dr. Delaney that he strongly desired to return to work as a police officer.

On August 17, 2001, the plaintiff, through his attorney, requested to be returned to light duty with the Bristol Police

Department.[1]  Pare Dep. at 56.  Pare states that he never received a response from the City.  Id.

On August 22, 2001, the City placed Pare on veteran reserve status, which is "an honorary grade" for police officers who, "through age or through physical disabilities incurred in the discharge of [their] duties, become permanently disqualified for the active duties of the police department." Pare Dep. at 59, Pl. L.R. 56(a)(2) Stmt. Ex. 5, Def. Mem. of Law Ex. L at § 214.3. Members of the veteran reserve receive half pay.  Def. Mem. of Law Ex. L at § 214.3.  Pare was placed on this status by the Board of Police Commissioners, see Pl. L.R. 56(a)(2) Stmt. Ex. 5, despite a letter from Dr. Patricia Barry, Pare's psychotherapist, to the Mayor urging that Pare be allowed to try going back to work.  Id. Ex. 6.

Pare objected to being placed in the veteran reserve and complained to his union representative.  Pare Dep. at 60.  The union attorney, Eric Brown, wrote a letter to the City on October 19, 2001 asking why Pare had not been placed on light duty even though his doctors had released him for such an assignment.  Id. Ex. 7.  No response is apparent in the record.  However, Pare and his attorney continued to assert that Pare should be given the chance to try a light duty assignment.

---

[1]This letter has not been made part of the summary judgment record.

Under the applicable collective bargaining agreement, the Bristol Police Department maintains six light duty positions for officers who are temporarily disabled.[2]  Def. Mem. of Law, Ex. J at § 6:5.  The light duty assignments are limited to "communications, front desk, [and] to assist administrative personnel."  Id.  Pare believed he was qualified for the front desk position.  The duties of that job include taking minor complaints, distributing forms to the public, preparing paperwork, and conducting hourly prisoner checks in the holding cells.  Def. Mem. of Law, Ex. K at 1-2.  Pare now also asserts that he was qualified for the position of dispatcher, which requires taking complaints and emergency calls and sending officers to answer calls "on a priority basis."  Id. at 2.

On November 27, 2001, Dr. Littman wrote that she had reviewed the job description for the front desk officer position and that, in her opinion, Pare could carry out the job. Pl. L.R. 56(a)(2) Stmt., Ex. 2.  Nonetheless, the City refused to remove plaintiff from veteran reserve status.

On December 24, 2001, Pare filed a complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO),

---

[2]The CBA provides: "The Chief shall have the authority to assign a total of six (6) employees for an indefinite period of time for the purpose of those employees (injured on duty) who are able to return to duty and who are on certified limited or light duty for medical or other reasons, and who are unable to perform most of their normal duties."  Def. Mem. of Law, Ex. J at § 6:5.

alleging that he was disabled within the meaning of state and federal law, and that the City of Bristol was denying him the opportunity to return to work with the requested reasonable accommodation of a light duty position.  Id. at Ex. 4.

On November 4, 2002, Dr. Delaney wrote to the worker's compensation committee stating his opinion that while Pare "did continue to show mild problems with new learning/ memory," he probably would be qualified to use a weapon and drive a car.  Id. at Ex. 3.

At the worker's compensation hearing, plaintiff alleges, "the defendant's designated representative, Steve Rybczyk, stated ... 'We're not taking Gerry back because we want a whole cop.'" Pl. Br. in Opp. at 7, citing Pare Dep. at 105.

In January 2003, Pare was examined by neuropsychologist Kimberlee J. Sass, who reviewed all prior clinical examinations and conducted his own.  Dr. Sass also examined plaintiff's school records, which revealed that over the course of the plaintiff's life, "a disparity existed between his intellectual capacity, which was average, and his achievements in situations that required learning and memory (i.e., classroom settings), which were appreciably below average. ...  The disparities ... indicate that [plaintiff] had deficiencies in learning and memory prior to being injured in February, 2000 ... ."  Report of Kimberlee J. Sass, Ph.D., 1/29/03, Def. Mem. of Law, Ex. I, at 4.  Dr. Sass

found upon his own examination that the plaintiff's "learning and memory were intact, except when testing procedures subjected him to interference." Id. at 16-17.  He stated that this diagnosis is "rarely disabling," and therefore, it was his "opinion that Mr. Pare currently possesses cognitive capacities that are sufficient for performing the routine duties of a police officer. ... I consider him to be fit for duty without restriction." Id. at 17.

At some point during spring 2003, plaintiff was fully reinstated to his job as a patrolman.  He now seeks backpay for the period between August 2001 and his reinstatement, when he claims he was qualified for light duty but assigned instead to veteran reserve status at half pay.

## II.  STANDARD

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.  "Where the record

9

taken as a whole could not lead a rational trier of fact to find
for the nonmoving party, there is no genuine issue for trial."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).

In moving for summary judgment against a party who will bear
the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if it can point to an absence of
evidence to support an essential element of the non-moving
party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need
not prove a negative when it moves for summary judgment on an
issue that the plaintiff must prove at trial.  It need only point
to an absence of proof on plaintiff's part, and, at that point,
plaintiff must 'designate specific facts showing that there is a
genuine issue for trial.'"  Parker v. Sony Pictures Entm't, Inc.,
260 F.3d 100, 111 (2d Cir. 2001), (quoting Celotex, 477 U.S. at
324); see also Gallo v. Prudential Residential Servs., 22 F.3d
1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain
summary judgment by showing that little or no evidence may be
found in support of the nonmoving party's case.").  The non-
moving party, in order to defeat summary judgment, must then come
forward with evidence that would be sufficient to support a jury
verdict in his or her favor.  Anderson, 477 U.S. at 249 ("[T]here
is no issue for trial unless there is sufficient evidence

favoring the nonmoving party for a jury to return a verdict for that party."). In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion. Matsushita, 475 U.S. at 587. However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient. Id. at 586 (citations omitted).

## III. DISCUSSION

The ADA prohibits discrimination against any "qualified individual with a disability because of the disability of such individual in regard to ... the hiring, ... or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "To make out a prima facie case under the ADA, a plaintiff must establish that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Giordano v. City of N.Y., 274 F.3d 740, 748 (2d Cir. 2001) (quoting Heyman v. Queens Vill. Comm. for Mental Health, 198 F.3d 68, 72 (2d Cir. 1999)); see also Raytheon Co. v. Hernandez, 540 U.S. 44, 50 n.3 (2003) (courts of appeal "have consistently utilized this

burden-shifting approach when reviewing motions for summary judgment in disparate-treatment cases" under the ADA).  The first and fourth elements are not disputed here.  However, defendant argues that Pare did not have a disability as defined in the statute and applicable regulations (or, alternatively, that Pare was not qualified to perform the essential functions of his position as a police officer during the time period at issue).  See Def. Mot. for Summary Judgment [Doc. # 21] at 1.

The ADA defines a disability as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities ...;
(B) a record of such an impairment; or
(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

Thus, a plaintiff may demonstrate disability within the meaning of the statute either by showing an actual disability or showing that the defendant regarded the plaintiff as having a disabling impairment.  At oral argument, plaintiff clarified that his claim is that defendant regarded him as disabled under subsection (C) of the statute.[3]  In Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999), the Supreme Court explained that an employee can be "regarded as" disabled in two ways: "(1) a covered entity mistakenly believes that a person has a physical

---

[3]As plaintiff recognized at oral argument, this claim is necessarily asserted only under the ADA, because the CFEPA provides no cause of action for "perceived" disability.  Beason v. United Techs. Corp., 337 F.3d 271, 279-80 (2d Cir. 2003).

impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities."  Because it is undisputed that Pare suffered from some impairment related to his traumatic brain injury, his claim falls in the second category.

However, "[m]erely having an impairment does not make one disabled for purposes of the ADA.  Claimants also need to demonstrate that the impairment limits a major life activity."  Toyota Motor Mfg. v. Williams, 534 U.S. 184, 195 (2002).  The regulations define "major life activities" to mean "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  45 C.F.R. § 84.3(i).

**A.   Regarded As Disabled from Working**

At oral argument, plaintiff stated he primarily was pursuing a claim that the City of Bristol regarded him as disabled from the major life activity of working.  A person is substantially limited "with respect to the major life activity of working" if he/she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working."  29 C.F.R. §
1630.2(j)(3)(i).

To succeed in his argument, Pare "must show not only that
the defendants regarded him as somehow disabled, but that they
regarded him as disabled within the meaning of the ADA."
Giordano, 274 F.3d at 748 (internal quotation marks and citations
omitted, emphasis in original).  Therefore, he must show that the
police department "perceived [him] as unable to work in a 'broad
class of jobs.'"  Id. at 750 (quoting Sutton, 527 U.S. at 491).

> To be substantially limited in the major life activity of
> working, then, one must be precluded from more than one
> type of job, a specialized job, or a particular job of
> choice. If jobs utilizing an individual's skills (but
> perhaps not his or her unique talents) are available, one
> is not precluded from a substantial class of jobs.
> Similarly, if a host of different types of jobs are
> available, one is not precluded from a broad range of
> jobs.

Sutton, 527 U.S. at 492.  For example, petitioners in Sutton, 527
U.S. at 493-94, were disqualified from working as "global airline
pilots" with a commercial airline because of poor eyesight, but
because "there are a number of other positions utilizing
petitioners' skills, such as regional pilot and pilot instructor,
to name a few," the Supreme Court held that the petitioners could
not show that they were disabled from working.

The Second Circuit addressed this issue in a law enforcement
context in Giordano, 274 F.3d at 742.  There, the plaintiff was
discharged from his job as a patrol officer for the New York City

14

Police Department because he took the drug Coumadin, an
anticoagulant, which some NYPD doctors were concerned placed him
at risk of excessive bleeding if he were injured in the line of
duty.  Giordano claimed that the NYPD erroneously regarded him as
disabled.  However, the Second Circuit affirmed summary judgment
in NYPD's favor, in part because Giordano produced no evidence of
the qualifications for related positions that might not have
placed him at physical risk, such as "a job as a security guard
or a private investigator, or with a police department that does
not require every officer to be capable of patrol duty."  Id. at
749.

> ... Giordano adduced no evidence of the qualifications
> for these jobs.  His assumption that his disqualification
> from the specific duties of an NYPD police officer will
> preclude him from working in related fields -- or that
> the defendants perceived him as such -- is, as the
> district court noted, '[s]peculation and conjecture,'
> which will not suffice 'to defeat a motion for summary
> judgment.'"

Id.

     As in this case, the defendant City of New York in
Giordano took the position that "the NYPD has no full duty/non-
patrol positions" to which it could assign the plaintiff.  Id.
The Second Circuit held that, "[t]his does not mean, however,
that the defendants regarded Giordano as disabled from a 'broad
class of jobs' compared to 'the average person having comparable
training, skills, and abilities.'" Id. (quoting Bartlett v. N.Y.
State Bd. of Law Exam'rs, 226 F.3d 69, 82 (2d Cir. 2000)).  In

other words, the fact that the NYPD had no position for which it believed Giordano to be physically qualified was insufficient to sustain Giordano's burden of proof of showing that the NYPD regarded him as disqualified from a substantial class of law enforcement-related jobs.

The Second Circuit's holding would also apply to a neurological, mental or memory impairment regarded as disabling, as in this case, and would require the plaintiff to proffer specific evidence that defendant's perception of Pare's inability to conduct rapid life-and-death decisionmaking necessarily leads to the conclusion that defendant perceived Pare as disqualified from a broad class of law enforcement jobs.  Pare has adduced no evidence that defendant regarded him as unable to fulfill the requirements of a position other than a police patrol job.  In his opposition brief Pare posits that he "was found incapable of performing the essential functions of [an] entire broad range of jobs," Opp. Br. at 13, but his argument is unsupported by the record, as none of his doctors made such a determination, and there is no record evidence from which it could be inferred that most law enforcement jobs also require some rapid life-and-death decisionmaking capability.  As early as February 2001, Dr. Littman released Pare to "return to competitive employment," but not "the type of life and death rapid decision making [required of] a street patrolman."  Report of Dr. Littman at 9.  She stated

16

that Pare would be qualified for "light duty within the police force," and suggested that "[i]f there are opportunities for teaching within the police force, he might be an excellent candidate. ... [H]e may also be a resource to work with policemen who have undergone emotionally traumatic experiences." Id. at 9-10.  Dr. Delaney concurred.  Report of Dr. Delaney, 7/12/01, at 6.  Thus, in relying on Pare's doctors' reports, the City could not have perceived Pare as disabled from all law enforcement work, given that his doctors cleared him to do such jobs as police academy teaching, peer counseling, or light duty police jobs.  While Pare asserts that a factual dispute exists regarding whether he was able to work as the Front Desk or Dispatch officer at the Bristol Police Department, this dispute is immaterial, because the issue is whether defendant regarded Pare as disabled from a broad class of jobs, not from one or two particular jobs within the Bristol Police Department.  Further, while Pare relies on a statement of a police department employee that "We're not taking Gerry back because we want a whole cop," this statement cannot be interpreted to mean that the Bristol Police Department believed Pare to be disabled from a broad class of jobs, only that the particular employee making the statement believed that Pare could not perform within the Bristol Police Department.

Plaintiff also contends that the Bristol police department regarded him as disabled from working because it placed him on

veteran reserve status, a position designed for permanently disabled officers.  See Brief in Opp. [Doc. # 26] at 13-14. However, the ordinance establishing the veteran reserve states that this grade is for officers who "become permanently disqualified for the active duties of the police department ...." Def. Mem. of Law, Ex. L, at § 214.3(d).  First, by its terms the ordinance only applies to duties at the Bristol Police Department, and the fact that Pare was put on veteran reserve status cannot suffice as evidence that the department viewed him as disqualified from a range of law enforcement positions available elsewhere.  Second, the department's position is that it placed him on reserve status because it had no <u>permanent</u> light duty positions available.  Under <u>Giordano</u>, the fact that the Bristol police department could not or would not offer Pare a light duty police officer job cannot, as a matter of law, support the inference that defendant regarded Pare as disabled from positions in related fields available to persons having comparable skills.  See <u>Giordano</u>, 274 F.3d at 749 (NYPD's argument that it had no non-patrol positions available "does not mean, however, that the defendants regarded [plaintiff] as disabled from a broad class of jobs ...").

Pare has produced no evidence concerning defendant's perceptions about his ability to perform law enforcement jobs other than those available at the Bristol Police Department.

Defendant takes the position that Pare was unable to perform even the light duty jobs of Front Desk and Dispatch because those jobs also required rapid decisionmaking, possible confrontation with suspects, and immediate triage of emergency phone calls, which according to Dr. Littman's report Pare was unable to do.  Reply Brief [Doc. # 28] at 5.  Thus while plaintiff has demonstrated that defendant believed plaintiff was unable to carry out any job available at the time in the Bristol Police Department, he has not come forward with evidence from which reasonable jurors could find that he also was perceived as unable to perform any law enforcement position "with a police department that does not require every officer to be capable of patrol duty," Giordano, 274 F.3d at 749, or jobs in a private setting, such as private investigator or security guard.  Without a showing that these positions, as well, generally require rapid police-patrol-type decisionmaking, jurors could not reasonably conclude that the Bristol Police Department's perceptions extended to plaintiff's capacity to perform these other jobs.

The plaintiff bears the burden of proof on this issue. Giordano, 274 F.3d at 750.  Because Pare has not shown that defendant regarded him as limited in performing any jobs other than the police officer positions in the Bristol Police Department, he cannot show that defendant regarded him as disabled from working in violation of the ADA.

**B.    Regarded As Disabled from Thinking**

At oral argument, plaintiff also raised the argument that the Bristol Police Department regarded him as substantially impaired in the activity of thinking.  "Thinking" has not been recognized as a separate major life activity.  The EEOC regulations list the more specific mental function of "learning" as a major life activity, 29 C.F.R. § 1630.2(i).  The Seventh and Eighth Circuits both have identified the manifestations of traumatic brain-injury, such as difficulties with "memory or concentration," as "feed[ing] into the major life activities of learning and working."  Moysis v. DTG Datanet, 278 F.3d 819, 825 (8th Cir. 2002), Emerson v. Northern States Power Co., 256 F.3d 506, 511 (7th Cir. 2001).  Here, plaintiff makes no claim that defendant perceived him as substantially restricted in "learning."  Other than defendant's perception that plaintiff had a diminished ability to handle patrol work requiring quick and critical decisionmaking and action, plaintiff offers no evidence that defendant otherwise perceived him as substantially impaired in his ability to think.  Because of the deficiencies in plaintiff's evidence analyzed above, defendant is entitled to summary judgment on this claim.

**IV.  CONCLUSION**

Defendant City of Bristol therefore is entitled to summary

judgment on all counts of plaintiff's complaint.[4]  Accordingly, defendant's motion for summary judgment [Doc. # 21] is GRANTED and this case will be closed.

IT IS SO ORDERED.

/s/

_____
JANET BOND ARTERTON, U.S.D.J.

**Dated at New Haven, Connecticut, this 31st day of August, 2005.**

_____

[4]Because plaintiff's ADA claim fails, his Rehabilitation Act claim also fails.  29 U.S.C. § 794(d) (Rehabilitation Act standard is identical to ADA standard); Howell v. New Haven Bd. of Educ., 309 F. Supp. 2d 286, 290 n. 1 (D. Conn. 2004) (analysis of disability discrimination case is the same under both ADA and Rehabilitation Act).  Plaintiff's "regarded as" claim is insufficient under the CFEPA.  See supra, n. 3.